TOOKEY, P. J.
*759 *71 In this class action, plaintiff, Steven Scharfstein, alleged that defendant, BP West Coast Products, LLC (BP), violated the Unlawful Trade Practices Act (UTPA) and the Gasoline Price Advertising Rule by illegally assessing and collecting debit card fees from millions of Oregon consumers.[1] Specifically, plaintiff alleged that BP engaged in unfair or deceptive gasoline price advertising when it failed to disclose that it charged a 35-cent fee for the use of a debit card to purchase gasoline at ARCO and am/pm service stations as required by the rule. A jury found that BP violated the UTPA when it charged a debit card fee because BP failed to disclose the debit card fee on its street signs and, alternatively, because BP charged more than the total amount registered on the gas pump. The trial court certified the class, which ultimately consisted of 2,046,500 individuals who, between January 1, 2011 and August 30, 2013, bought gasoline at Oregon ARCO or am/pm service stations with a debit card and were charged a 35-cent debit card fee. The trial court entered an amended general judgment that awarded plaintiff and the class attorney fees, costs, and $409,300,000 in statutory damages. BP appeals that judgment, raising 10 assignments of error. As we will explain, we conclude that the trial court did not commit reversible error and, accordingly, we affirm.[2]
I. BACKGROUND
A. Historical Facts
"Because plaintiffs prevailed before the jury in the trial court, we review the facts in the light most favorable to them." Hall v. Dept. of Transportation , 355 Or. 503, 505, 326 P.3d 1165 (2014). BP is a retailer of ARCO-brand gasoline products throughout Oregon, and is a franchisor of *72 the ARCO and am/pm franchise. BP oversees the independent dealer operated ARCO and am/pm service stations in Oregon, and it retains certain rights relating to the implementation of brand standards at ARCO and am/pm service stations. At some ARCO and am/pm service stations, BP assesses a 35-cent fee when a customer pays with a debit card. BP is responsible for the street signs, and it does not allow its franchisees to disclose the debit card fee on its street signs. Additionally, when a customer pays for gasoline with a debit card, the fee is not registered on the gasoline dispensing device and the customer pays more than the amount registered on the pump.
B. Plaintiff's Specific UTPA Claims
On December 29, 2011, plaintiff filed a putative class action complaint against BP
*760 alleging that BP illegally assessed and collected debit card fees in violation of the UTPA. ORS 646.608(1)(u) provides that a "person engages in an unlawful practice if in the course of the person's business, vocation or occupation the person * * * [e]ngages in any other unfair or deceptive conduct in trade or commerce." For a person's conduct to constitute "any other unfair or deceptive conduct in trade or commerce" under ORS 646.608(1)(u), the Attorney General must adopt an administrative rule prohibiting that specific conduct. See ORS 646.608(4) ("An action or suit may not be brought under subsection (1)(u) of this section unless the Attorney General has first established a rule * * * declaring the conduct to be unfair or deceptive in trade or commerce."). As we discuss in more detail below, the Attorney General has adopted a rule in OAR chapter 137, division 20, declaring that unfair or deceptive gasoline price advertising is an unlawful trade practice.
In his complaint, plaintiff alleged that BP violated numerous provisions of OAR 137-020-0150. As relevant here, plaintiff alleged that BP "failed to clearly and conspicuously display on all street signs * * * the debit fee charge in violation of OAR 137-020-0150(3)(d)(A)." That rule requires retailers of gasoline to disclose any "condition" affecting the availability of the lowest cash price for gasoline that is advertised on their street signs. See OAR 137-020-0150(3)(d)(A) ("[i]f the lowest cash prices are available only under some *73 conditions * * * [t]he retailer must clearly and conspicuously display all conditions on each street sign, price sign and dispensing device (e.g ., cash only, mini serve")). OAR 137-020-0150(1)(b) defines "condition" as "any payment method (e.g ., credit), service level (e.g ., full service or mini service), or any other modifying circumstance affecting the price per unit of measurement of motor vehicle fuel from the lowest cash price." Additionally, plaintiff alleged that BP "charged more to members of the class than the total amount registered on the dispensing device in violation of OAR 137-020-0150 (4)(e)," which requires retailers to "[c]harge the customer only the total amount registered on the dispensing device at the selected unit price."
C. Procedural Background
To provide general context for the assignments of error, we outline the procedural history of this case. We provide more detail later in our discussion of each individual assignment of error.
Plaintiff sought class certification, and, on August 30, 2013, the court certified a class of individuals who, between January 1, 2011 and August 30, 2013, bought gasoline at Oregon ARCO or am/pm service stations with a debit card and were charged a debit card fee. Before trial, BP moved for summary judgment, arguing that it had not violated OAR 137-020-0150(4)(e) as a matter of law. The court denied BP's motion for summary judgment. The claims proceeded to trial in January 2014. At the close of evidence, BP moved for directed verdict on plaintiff's claim under OAR 137-020-0150(3)(d)(A), arguing that the evidence was insufficient to prove that it had violated that rule. Additionally, BP argued that plaintiff had failed to prove causation or reliance. The trial court denied BP's motion for directed verdict. On January 31, the jury returned a verdict of liability for statutory damages after separately finding that BP had violated OAR 137-020-0150(4)(e) and OAR 137-020-0150(3)(d)(A).[3]
*74 On February 4, 2014, the jury returned a verdict in favor of BP on the issue of punitive damages.
Then in April of that year, BP filed two motions: The first was a motion to dismiss on the grounds that the Gasoline Price Advertising Rule is invalid, and the second was a motion to strike or, alternatively, to decertify the class on the ground that the statutory damages were unconstitutionally excessive. The trial court denied those motions. On December 14, 2015, after the Supreme Court decided Pearson v. Philip Morris, Inc. , 358 Or. 88, 361 P.3d 3 (2015), BP filed alternative motions for judgment notwithstanding the *761 verdict (JNOV), new trial, and class decertification, reiterating its argument that plaintiff had failed to prove reliance on a class-wide basis. The court denied those motions. On May 31, 2016, the court entered an amended general judgment awarding the 2,046,500 members of the class attorney fees, costs, and $409,300,000 in statutory damages. BP appeals that judgment.
II. DISCUSSION
A. Challenges to OAR 137-020-0150
In its first, second, and third assignments of error, BP challenges various provisions of OAR 137-020-0150, also known as the Gasoline Price Advertising Rule. In BP's second and third assignments, the essence of BP's argument is that the rule does not apply to any "flat fee" that is not part of the price per gallon of fuel. We disagree. As we explain below, the rule applies to "conditions" that affect the price per gallon of fuel. The 35-cent debit card fee is a "condition" that affects the price per gallon and, thus, the fee must be displayed on each street sign. Because BP charged a 35-cent debit card fee and did not disclose that "condition" on its street sign as required by OAR 137-020-0150(3)(d)(A), the trial court did not err in denying BP's motion for directed verdict. Additionally, we decline to address BP's challenge to plaintiff's alternative theory of liability under OAR 137-020-0150(4)(e) because, even if it was error to submit that theory of liability to the jury, it would be harmless because the jury separately found BP in violation of OAR 137-020-0150(3)(d)(A).
*75 1. The regulatory framework of OAR 137-020-0150.
ORS 646.930 establishes the minimum requirements that a service station must meet if it has a fuel price sign that is visible from the street. BP West Coast Products, LLP v. Dept. of Justice , 284 Or. App. 723, 725, 396 P.3d 244, rev. den. , 361 Or. 800, 400 P.3d 921 (2017). ORS 646.930(1)(a) provides that a person operating a "service station, business, or other place for the purpose of retailing and delivering gasoline, diesel or other fuel" may "display on a sign visible from the street the lowest cash prices charged for the sale of the lowest grades of gasoline, diesel or other fuel." Under ORS 646.930(2)(b), if "a cash price displayed on a sign is available only under some conditions, the sign and the dispensing device must clearly state the conditions." The legislature did not define the term "conditions."
OAR 137-020-0150 was adopted pursuant to Oregon Laws 1985, chapter 751, section 2, and ORS 646.608(1)(u). Oregon Laws 1985, chapter 751, section 2, required the Attorney General to adopt rules to aid in the implementation of former ORS 646.875, renumbered as ORS 646.930 (1985). The other statutory grant of rulemaking authority, ORS 646.608(1)(u), gives the Attorney General broad rulemaking authority under the UTPA to protect consumers from "any other unfair or deceptive conduct in trade or commerce." See BP West Coast Products, LLP , 284 Or. App. at 734-37, 396 P.3d 244 (discussing the "Attorney General's broad grant of rulemaking authority" under the UTPA "to identify and prohibit 'any other unfair or deceptive conduct' concerning the display of fuel prices" (quoting ORS 646.608(1)(u) ) ). For a person's conduct to constitute "any other unfair or deceptive conduct in trade or commerce," the Attorney General must adopt an administrative rule prohibiting that specific conduct. See ORS 646.608(4) ("An action or suit may not be brought under subsection (1)(u) of this section unless the Attorney General has first established a rule * * * declaring the conduct to be unfair or deceptive in trade or commerce.").
The Attorney General has adopted a rule in OAR chapter 137, division 20, declaring unfair or deceptive gasoline price advertising an unlawful trade practice. See OAR 137-020-0160(3) ("Violation of OAR 137-020-0150 and this *76 rule is a violation of the Unlawful Trade Practices Act, ORS 646.608(1)(u)."). OAR 137-020-0150(3)(a) provides that, "[i]f a retailer displays a price for motor vehicle fuel," the "retailer must clearly and conspicuously display on each street sign the lowest cash prices charged for the sale of the lowest grade of each type of motor vehicle fuel sold or offered for sale to all customers or potential customers." OAR 137-020-0150(3)(d)(A), in turn, requires the disclosure of any condition *762 affecting the availability of the lowest cash price. The text of that rule provides that, "[i]f the lowest cash prices are available only under some conditions," the "retailer must clearly and conspicuously display all conditions on each street sign, price sign and dispensing device (e.g ., cash only, mini serve)." OAR 137-020-0150(3)(d)(A).
In 2010, the Attorney General defined "condition" under OAR 137-020-0150(1)(b) as "any payment method (e.g ., credit), service level (e.g ., full service or mini service), or any other modifying circumstance affecting the price per unit of measurement of motor vehicle fuel from the lowest cash price," to address the numerous complaints that the Department of Justice had received "pertaining to disclosure of full service and added fees to use credit or debit cards." Oregon Bulletin, Volume 50, No. 2, p. 167-69 (February 2011); see also Notice of Proposed Rulemaking, Statement of Need and Fiscal Impact, filed Nov. 9, 2010.
2. Is the Attorney General's definition of condition under OAR 137-020-0150(1)(b) invalid?
In BP's third assignment of error, BP argues that "the trial court erred in denying defendant's motion to dismiss for failure to state a claim," because "[t]he rule's definition of 'condition' is invalid." After we decided BP West Coast Products, LLP , plaintiff filed a supplemental memorandum of authorities, arguing that our decision in that case "rejects defendant's challenge to [the validity of] OAR 137-020-0150(1)(b)." BP concedes, and we agree, that BP West Coast Products, LLP , controls the outcome of BP's third assignment of error and, therefore, we reject BP's third assignment of error.
We do pause, however, to briefly discuss that case to provide some background before turning to BP's second *77 assignment of error. In BP West Coast Products, LLP , we concluded that the legislature had granted the Attorney General broad rulemaking authority under the UTPA to protect consumers by regulating the display of fuel prices-including the authority to define "condition." 284 Or. App. at 737, 396 P.3d 244. In reaching that conclusion, we observed that the primary purpose of ORS 646.930 was "to protect consumers by enacting '[f]uel station signage requirements * * * during the 1980's to address situations where some fuel stations were placing signs advertising a low but misleading price for fuel on the street [sign] that did not match the higher prices they were charging at the pump.' " Id . at 734, 396 P.3d 244 (quoting Staff Measure Summary to House Bill (H.B.) 3677 A (2010) ). One specific situation that was discussed at the legislative hearings was service stations charging a consumer more than the price displayed on its street sign when the consumer paid with a credit card. Id . at 731-32, 396 P.3d 244. We concluded that "[c]harging a consumer more than the displayed price if a consumer uses a credit card is an example of a modifying circumstance that affects the availability of the lowest cash price." Id. at 732, 396 P.3d 244 (citing Springfield Education Assn. v. School Dist. , 290 Or. 217, 226, 621 P.2d 547 (1980) ("In some cases, legislative history will reveal that certain situations were expressly considered and intended to be included or excluded.") ). After we acknowledged the Attorney General's broad grant of rulemaking authority under the UTPA, we also concluded that the Attorney General had the statutory authority to define "condition" to ensure the " 'disclosure of * * * added fees to use credit or debit cards .' " Id . at 736-37, 396 P.3d 244 (quoting Oregon Bulletin, Volume 50, No. 2, p. 167-69 (Feb. 2011) (emphasis added) ). With the purpose for which the legislature enacted ORS 646.930 and the purpose for which the Attorney General adopted the definition of condition in mind, we now turn to BP's second assignment of error.
3. Is a 35-cent debit card fee a condition that must be disclosed on a service station's street sign under OAR 137-020-0150(3)(d)(A) ?
With respect to BP's second assignment of error, BP asserted at trial that "the rule defines a condition [as one] that 'affect[s] the price per unit of measurement of *78 motor vehicle fuel from the lowest cash price,' " and argued "[b]ecause there is no evidence that the debit fee affects the price per unit of measurement, directed verdict should be *763 granted for [BP] on the issue of condition." In other words, BP contended that a debit card fee is not a "condition" because "the debit fee is not a charge for motor fuel, but for debit card processing." The trial court denied BP's motion for directed verdict. On appeal, BP assigns error to that ruling, renewing its argument that "a debit card fee is not a 'condition' under subsection (3)(d)(A)" and "thus, does not need to be posted on the street sign" because "[a] per-transaction debit-card fee * * * does not affect the price of the fuel at all."
To determine whether a debit card fee is a "condition" under OAR 137-020-0150, "we consider the text of the rule and its context, including other portions of the rule and related laws, and the rule's adoption history." Brand Energy Services, LLC v. OR-OSHA , 261 Or. App. 210, 214, 323 P.3d 356 (2014). "[W]e begin by examining the text of the rule itself, together with its context" to "discern the meaning of the words used, giving effect to the intent of the body that promulgated the rule." Tye v. McFetridge , 342 Or. 61, 69, 149 P.3d 1111 (2006). As noted, OAR 137-020-0150(3)(a) provides, in part, that "[i]f a retailer displays a price for motor vehicle fuel * * * [t]he retailer must clearly and conspicuously display on each street sign the lowest cash prices charged for the sale of the lowest grade of each type of motor vehicle fuel." Furthermore, OAR 137-020-0150(3)(d)(A) provides, in part, "[i]f the lowest cash prices are available only under some conditions * * * [t]he retailer must clearly and conspicuously display all conditions on each street sign." OAR 137-020-0150(1)(b) defines "condition" as "any payment method (e.g ., credit), service level (e.g. , full service or mini service), or any other modifying circumstance affecting the price per unit of measurement of motor vehicle fuel from the lowest cash price."
As we explain below, BP's interpretation of "condition" cannot be reconciled with the Attorney General's definition of "condition" under OAR 137-020-0150(1)(b). The definition of condition under OAR 137-020-0150(1)(b) specifically refers to "credit" as a "payment method" that is regulated by the rule. There is no dispute that a debit card is *79 a "payment method." Hence, if using that payment method "affect[s] the price per unit of measurement of motor vehicle fuel from the lowest cash price," it is a condition. The dictionary definitions of "affect" include "to act upon," "to produce a material influence upon or alteration in," "to have a detrimental influence on," and "to make an impression on." Webster's Third New Int'l Dictionary 35 (unabridged ed. 2002). "Common to all of those definitions is that the thing affecting actually make a difference to the thing affected." Shannon Plantations, Inc. v. Berovic , 159 Or. App. 283, 294, 976 P.2d 1149 (1999).
Here, the 35-cent fee that BP charged for the use of a debit card "actually [made] a difference" to the price per unit of measurement of motor vehicle fuel from the lowest cash price. Id . If one adds the 35-cent fee to the total cash price of the fuel dispensed, and divides that by the number of gallons dispensed, the result is an increase in the price per unit of measurement of motor vehicle fuel from the lowest cash price. For example, if a customer buys $5.00 of gas in cash and receives two gallons, the cash price per unit is $2.50 per gallon (5 ÷ 2 = 2.5). However, if a customer buys $5.00 of gas and uses a debit card the customer pays $5.35 for two gallons of gas, which results in a debit card price per unit of $2.67 per gallon (5.35 ÷ 2 = 2.675). In that example, the debit card fee increases the price per gallon by 17 cents.[4] Thus, the 35-cent debit card fee makes an actual difference on "the price per unit of measurement of motor vehicle fuel from the lowest cash price." OAR 137-020-0150(1)(b).
BP asserts that, under that logic, "a pack of gum purchased together with fuel would also affect the 'price per unit of motor fuel' because it increases the total amount charged in the transaction." But a pack of gum is not a "payment method" or a "service level" and, applying the principle of ejusdem generis , it would not qualify as a "modifying *764 circumstance" that falls within the Attorney General's definition of condition under OAR 137-020-0150(1)(b). See *80 Schmidt v. Mt. Angel Abbey , 347 Or. 389, 403-05, 223 P.3d 399 (2009) (when applying the principle of ejusdem generis ("of the same kind"), our interpretation of the general term includes consideration of the specific examples). Moreover, in the context of consumer purchases, every transaction involves a payment method, and a payment method is not sufficiently distinct from the purchase of a good or service to qualify as a separate service. A customer cannot, for example, purchase the 35-cent debit card fee separately from any other service or product offered for sale. The debit card fee thus increases the price of the motor vehicle fuel that a customer receives, whereas a pack of gum is a separate good that the customer receives through an optional purchase in addition to any fuel the customer may purchase.
Other portions of the rule and related laws con-firm our conclusion that a debit card fee is a "condition" that the Attorney General intended to be posted on a service station's street sign. As noted above, ORS 646.930 (1)(a) and OAR 137-020-0150(3)(a) allow service stations to post the "lowest cash prices" for motor vehicle fuel on street signs. However, both ORS 646.930(2)(b) and OAR 137-020-0150(3)(d)(A) require that all "conditions" be "clearly" stated on the service station's street sign if the conditions affect the availability of the displayed cash price. The "primary purpose" of the statute and the rule is to "protect consumers" by "requiring the disclosure of 'conditions' to ensure that the price displayed on a service station's street sign matches the price a consumer can expect to pay at the pump." BP West Coast Products, LLP , 284 Or. App. at 734, 396 P.3d 244.[5] Moreover, because OAR-137-020-0150 was adopted pursuant to ORS 646.608(1)(u), "it is to be interpreted liberally as a protection to consumers." State ex rel. Redden v. Discount Fabrics , 289 Or. 375, 386 n. 8, 615 P.2d 1034 (1980) ; see also Graham v. Kold Kist Beverage Ice, Inc. , 43 Or. App. 1037, 1040, 607 P.2d 759 (1979) ("the primary purpose of the [UTPA] was to protect consumers , rather than businesses" (emphasis in original) );
*81 Denson v. Ron Tonkin Gran Turismo, Inc. , 279 Or. 85, 90 n. 4, 566 P.2d 1177 (1977) (discussing the legislative history of the UTPA).
BP asserts, however, that, "[i]f a per-transaction debit-card fee were a 'condition,' * * * the rule effectively would prohibit retailers from charging any flat fee in connection with the sale of fuel." We are not persuaded by that contention; the goal of the rule is to provide notice to the customer of any "conditions" that affect the price per unit of motor vehicle fuel from the street sign to the point of sale, not to prohibit a flat fee for using a debit card. As noted, OAR 137-020-0150(3)(d)(A) requires that all "conditions" be "clearly" displayed on the service station's street sign. Additionally, OAR 137-020-0150(5)(a)(A) requires that "at least one price sign is visible at or near each dispensing device," and under OAR 137-020-0150(5)(d) and (e), the price sign must also display "[a]ll words or symbols of condition." Finally, OAR 137-020-0150(4)(f) requires that "the dispensing device clearly and conspicuously states all conditions" if "the lowest cash prices are available only under some conditions."[6] The rule does not prohibit charging a flat fee for the use of a particular payment method if that fee is properly disclosed pursuant to the rule.
For example, a price sign on top of a dispensing device must provide the "whole unit price of any condition," OAR 137-020-0150(5)(d)(B)(ii)(I), or the "additional price per unit of measurement for any condition in whole cents (e.g. , 'credit price + 3¢/gal' or 'full service additional 10¢/gal')."
*765 OAR 137-020-0150(5)(d)(B)(ii)(II) ; see also OAR-137-020-0150(5)(e)(B)(ii) (the retailer must ensure that price signs on the island or on the side of the retailer's building display "the whole unit price of any condition."). OAR 137-020-0150(1)(p) defines a "[u]nit of measurement" as "a United States gallon or liter." Thus, the "additional price per unit of measurement for any condition" refers to the additional price per gallon for any condition, e.g. , credit price + 3¢/gallon, whereas the "whole unit price of any condition" refers to *82 the total price of any condition, e.g. , 35-cent debit card fee. See Webster's at 2611 (defining whole as "constituting the total sum or undiminished entirety of * * * constituting an undivided unit * * * seemingly complete or total"); State v. Ferguson , 228 Or. App. 1, 6, 206 P.3d 1145 (2009) (under our interpretive principles, we assume that different terms in related rules have different meanings). The specific option to disclose the "whole unit price of any condition" confirms that a flat 35-cent debit card fee is a "condition" that must be disclosed pursuant to the rule.
BP's interpretation of "condition" also overlooks "the rule's adoption history." Brand Energy Services, LLC , 261 Or. App. at 214, 323 P.3d 356. That history demonstrates that the Attorney General expressly defined "condition" to ensure that a debit card fee would be a "condition" that must be disclosed because it is an added fee for the use of a debit card that affects the lowest cash price. As we discussed in BP West Coast Products, LLP , "[t]he Attorney General adopted the definition of 'condition' in 2010 to address the numerous complaints that the Department of Justice had continued to receive since ORS 646.930 was amended in 1985 'pertaining to disclosure of * * * added fees to use credit or debit cards .' " 284 Or. App. at 736, 396 P.3d 244 (quoting Oregon Bulletin, Volume 50, No. 2, p. 167-69 (February 2011) (emphasis added) ); see also Notice of Proposed Rulemaking, Statement of Need and Fiscal Impact, filed Nov. 9, 2010 ("The Oregon Department of Justice received numerous consumer complaints regarding the difference between the advertised and actual price of fuel, mostly due to * * * additional fees for using credit or debit cards," and "[t]he rule clarifies how retailers must disclose conditions under which the cash price is not available."). Adding a 35-cent debit card fee to the advertised cash price affects the advertised price of fuel. Thus, it is a "condition" that must be disclosed "to ensure that the price displayed on a service station's street sign matches the price a consumer can expect to pay at the pump." BP West Coast Products, LLP , 284 Or. App. at 734, 396 P.3d 244.
In light of the text of the rule and its context, the other portions of the rule and related laws, and the rule's adoption history, we conclude that the 35-cent debit card *83 fee is a "condition" that affects the price of fuel under OAR 137-020-0150(1)(b). It is undisputed that BP charged a debit card fee and that BP did not disclose that "condition" on its street sign as required by OAR 137-020-0150(3)(d)(A). Thus, the trial court did not err in denying BP's motion for directed verdict.
4. Does OAR 137-020-0150(4)(e) require a debit card fee to be registered on the dispensing device?
Plaintiff's alternative theory of liability was that BP had violated OAR 137-020-0150(4)(e), which requires retailers of motor vehicle fuel to "[c]harge the customer only the total amount registered on the dispensing device at the selected unit price." With regard to BP's first assignment of error, we agree with plaintiff that any error in denying BP's motion for summary judgment and submitting the theory of liability under OAR 137-020-0150(4)(e) to the jury was harmless because the jury found BP liable for violating both OAR 137-020-0150(4)(e) and OAR 137-020-0150(3)(d)(A). The jury separately found on the verdict form that BP violated OAR 137-020-0150(3)(d)(A) by charging a 35-cent debit card fee and not disclosing that "condition" on its street sign as required by OAR 137-020-0150(3)(d)(A). The jury's finding of liability under that theory is sufficient to independently support the $200 award of statutory damages per class member and the trial court's judgment in favor of plaintiff. See Fossen v. Clackamas County , 271 Or. App. 842, 849-50, 352 P.3d 1288 (2015) (because false-imprisonment claim was properly *766 submitted to the jury and was sufficient to support its award to plaintiff and the trial court's judgment in the plaintiff's favor, we would not resolve whether the trial court erred in submitting negligence claims to the jury).[7] *84 Additionally, both theories of liability in this case were based on the same evidence of plaintiff's purchase of gasoline with a debit card, and the evidence of BP's culpable mental state applied to both theories of liability. See Purdy v. Deere and Company , 355 Or. 204, 228-30, 324 P.3d 455 (2014) (discussing Shoup v. Wal-Mart Stores Inc. , 335 Or. 164, 61 P.3d 928 (2003), where error in submitting an "invalid" theory of liability to the jury did not "substantially affect the defendant's rights, because the same evidence applied to all three theories of liability, and there was little likelihood that the jury had based its verdict on the invalid theory alone"). BP has not shown how sending the theory of liability under OAR 137-020-0150(4)(e) to the jury substantially affected its rights. ORS 19.415(2). Therefore, we need not resolve whether it was proper to send the question of whether BP violated OAR 137-020-0150(4)(e) to the jury because, even if it was error, it would be harmless.
5. Conclusion on BP's challenges to OAR 137-020-0150.
In sum, we reject BP's third assignment of error because our decision in BP West Coast Products, LLP , that the Attorney General had the authority to define "condition" under OAR 137-020-0150(1)(b), is controlling. With respect to BP's second assignment, we conclude that a 35-cent debit card fee is a "condition" under OAR 137-020-0150(1)(b) and, therefore, the trial court did not err in denying BP's motion for directed verdict because there is evidence that BP did not post that "condition" on its street sign as required by OAR 137-020-0150(3)(d)(A). In light of our conclusion regarding BP's second and third assignments, we decline to address BP's first assignment concerning whether it was error to send plaintiff's alternative theory of liability under OAR 137-020-0150(4)(e) to the jury because, even if it was error, it would be harmless.
B. Ascertainable Loss Resulting From UTPA Violation
In a combined argument on BP's fourth and fifth assignments of error, BP relies on Pearson , 358 Or. 88, 361 P.3d 3, to urge that "[p]laintiff did not, and could not, prove [an] ascertainable loss resulting from the alleged UTPA violation on *85 a class-wide basis."[8] BP argues that, under Pearson , plaintiff was required to prove "that he would not have paid the fee if it had been posted on the street sign and included in the amount registered on the dispenser-in the parlance of Pearson , he was required to prove reliance."
We disagree. As we will describe, the nature of the unlawful trade practice and the ascertainable loss alleged in this case are materially distinguishable from the plaintiffs' misrepresentation claim and theory of economic loss in Pearson . Here, a reasoned analysis of plaintiff's claim leads us to conclude *767 that reliance is not required to prove causation.
At the close of evidence, BP moved for directed verdict, arguing that plaintiff had failed to prove the existence of an ascertainable loss, causation, or reliance. In discussing the pending motion for directed verdict, the trial court stated, "I believe at all times I've been clear and my rulings have been consistent in these regards; that this is an illegal transaction case; that the element of reliance is out of the case, need not be proven because it is an illegal transaction case under the UTPA." The trial court denied the motion for directed verdict.
After Pearson was decided, BP made alternative motions for JNOV, new trial, and class decertification based on the issues of causation and reliance. BP contended that the Supreme Court's holding in Pearson was controlling in this case, and that "[p]laintiff failed to make the causation showing that Pearson requires." BP continued, stating that,
"[u]nder Pearson , * * * to prove that the ascertainable loss resulted from defendant's failure to disclose the debit card fee as required by the Gasoline Price Advertising Rule, plaintiff was required to show that he and the other class *86 members relied on the signage-or lack thereof-in deciding to use a debit card to pay for their gasoline purchases."
Plaintiff responded that "the Pearson decision fully confirms that this court correctly interpreted the Unlawful Trade Practices Act," and argued that Pearson is distinguishable because this case does not involve an allegation that BP "violated ORS 646.608(1)(e), the part of the statute that prohibits misrepresentations of characteristics, benefits, or qualities in the course of a person's business." Plaintiff asserted that reliance does not "apply in this case involving failure to provide legally required information followed by overcharge of a fee not allowed." The court agreed with plaintiff's arguments, in conjunction with "what ha[d] been presented earlier relating to these matters during the prior course of this litigation," and denied the motions.
On appeal, BP assigns error to the trial court's denial of its motion for directed verdict "because plaintiff failed to prove that the alleged UTPA violation caused plaintiff and the class to suffer an ascertainable loss of money or property." BP also assigns error to the court's denial of its post-verdict motion to decertify the class "because individual questions predominate, making a class action not superior." In a combined argument on those assignments, BP contends that plaintiff was required to prove reliance as part of his UTPA claim and, hence, the trial court erred in denying those motions because plaintiff did not, and could not, prove reliance on a class-wide basis. In response, plaintiff contends that "[i]n an illegal charge or certain nondisclosure cases the charge itself is illegal without reference to the difference in value" and "[t]he 'ascertainable loss' is the illegal overcharge and causation occurs when it is paid." Plaintiff asserts that, in that kind of case, reliance is not required.
"We review the denial of a motion for directed verdict * * * to determine whether the moving party is entitled to a verdict as a matter of law." Schmidt v. Noonkester , 287 Or. App. 48, 53, 401 P.3d 266 (2017). As to the post-verdict motion to decertify the class, "[t]he single predominance factor [under ORCP 32 B(3) ] is reviewed for legal error." Migis v. Autozone, Inc. , 282 Or. App. 774, 782, 387 P.3d 381 (2016).
*87 At its core, BP's combined argument asks us to resolve a legal question-whether plaintiff's specific UTPA claim requires proof of reliance.
A class action for statutory damages may be maintained under the UTPA "only if the plaintiffs in the action establish that the members have sustained an ascertainable loss of money or property as a result of a reckless or knowing use or employment by the defendant of a method, act or practice declared unlawful by ORS 646.608." ORS 646.638 (8)(a) (emphasis added). That emphasized phrase, "as a result of," requires that the "plaintiff must suffer a loss of money or property that was caused by the unlawful trade practice." Pearson , 358 Or. at 127, 361 P.3d 3 (emphasis in original). "Whether, to prove the requisite causation, a plaintiff must *768 show reliance on the alleged unlawful trade practice depends on the conduct involved and the loss allegedly caused by it." Id .
In Pearson , the class pursued a claim under ORS 646.608(1)(e),[9] asserting that the "[d]efendant both affirmatively misrepresented that its light cigarettes would inherently deliver low tar and nicotine and failed to disclose that, in order to receive lower tar and nicotine, the smoker would have to smoke the light cigarettes in a particular way." 358 Or. at 117-18, 361 P.3d 3 (internal quotation marks omitted). The plaintiffs claimed that the class members suffered ascertainable losses as a direct result of that misrepresentation and sought relief for "[e]conomic damages for purchase price refund or diminished value, in an amount to be proved at trial." Id. (internal quotation marks omitted). The Supreme Court concluded that the "plaintiffs' theory of diminished value provide[d] no logically viable theory on which class-wide economic losses can be established" because there was "no difference in the price between a product with the represented feature [of lightness] and one without." Id . at 124, 361 P.3d 3.
As to the plaintiffs' alternative theory of economic loss, the plaintiffs sought a refund of their purchase price as a remedy "based on their and the class members' alleged failure to receive what defendant's representation led them *88 to believe they were buying," i.e. , cigarettes that were lower in tar and nicotine than the defendant's regular cigarettes. Id . The court noted that, "[a]lthough reliance is not, in and of itself, an element of a UTPA claim, it is a natural theory to establish the causation of the loss * * * for a purchaser seeking a refund based on having purchased a product believing it had a represented characteristic that it did not have." Id . at 126, 361 P.3d 3. The court concluded that, "when the claimed loss is the purchase price, and when that loss must be 'as a result' of a misrepresentation, reliance is what 'connects the dots' to provide the key causal link between the misrepresentation and the loss." Id .
In this case, plaintiff's complaint alleged "that defendant violated gasoline price disclosure rules and illegally assessed and collected debit card fees in violation of the rules." More specifically, according to the complaint, BP engaged "in a prohibited transaction by charging gasoline purchase debit fees without first properly disclosing the fees as required by OAR 137-020-0150" and in violation of ORS 646.608(1)(u). As required for their UTPA class action under ORS 646.638(8), plaintiffs asserted:
"Defendants assessed plaintiff and the class debit fees in reckless disregard of the requirements of ORS 646.608 (1)(u) and/or with knowledge that their fee assessments violated ORS 646.608(1)(u) and as a result, plaintiff and members of the class suffered ascertainable losses, in that they paid fees that defendants were not legally entitled to collect."
In other words, plaintiff's theory of ascertainable loss was that BP illegally charged class members an unlawful 35-cent debit card fee and, therefore, "[p]laintiff and the class are entitled to recover statutory damages of $200 per class member." See ORS 646.638(1) and (8)(a) (class members can recover "actual damages or statutory damages of $200, whichever is greater"). Thus, plaintiff claimed that the illegal overcharge of 35-cents is the ascertainable loss.
Unlike the plaintiffs in Pearson , plaintiff did not allege that BP made misrepresentations or "half-truths" about the quality or characteristics of the gasoline in violation of ORS 646.608(1)(e) or seek a refund of the purchase *89 price. Nevertheless, BP argues that plaintiffs were required to prove that they would have relied on a disclosure that BP failed to provide, but was legally required to provide before charging the 35-cent debit card fee. As we have noted, "proof that a party justifiably relied on a representation is not necessary when the representation involves a matter about which the party making it is legally required to inform the other." *769 Tri-West Const. v. Hernandez , 43 Or. App. 961, 972, 607 P.2d 1375 (1979), rev. den. , 288 Or. 667, --- P.3d ---- (1980).
In an illegal charge case such as this one, whether a customer relied on the nondisclosure of a fee does not matter; what matters is whether the fee is disclosed in the particular way that the law requires. The UTPA prohibits businesses from charging customers other types of fees when they are not disclosed in the particular way that the law requires. For example, lessors are required to disclose any late payment, default, pickup and reinstatement fees in the lease-purchase agreement. ORS 646.608(1)(nn) ; ORS 646A.124 ; ORS 646A.126(7). Likewise, late fees assessed by cable service providers are subject to several requirements and limitations (amount, disclosure, and notice provisions). ORS 646.608(1)(rr) ; ORS 646A.800(2) to (4). Similarly, debt management service providers are allowed to charge certain types of fees only after making required disclosures. ORS 646.608(1)(kkk) ; ORS 697.692 ; ORS 697.707. If any of those businesses were to violate any of the terms under which they may assess those fees, the assessment would result in an illegal charge. The customer's actual awareness or knowledge of the illegality would be irrelevant. The particular violation of the UTPA alleged in this case-that BP illegally charged class members an unlawful 35-cent debit card fee because it did not disclose the fee as required by OAR 137-020-0150 -does not turn on the customer's knowledge or reliance.
Unlike in Pearson , 358 Or. at 127, 361 P.3d 3, proof of reliance on BP's nondisclosure was not "integral" to plaintiffs' claim that BP illegally charged class members an unlawful 35-cent debit card fee. As discussed in the previous section of this opinion, the 35-cent debit card fee is a "condition," and the Attorney General's rule required BP to disclose the *90 35-cent debit card fee on its street sign before charging the fee. See Notice of Proposed Rulemaking, filed Nov. 9, 2010 (the rules "address where and when gasoline prices and any conditions to the lowest cash price may be displayed and charged " (emphasis added) ). BP failed to disclose the legally required information and assessed a debit card fee in violation of the UTPA. In doing so, BP illegally charged its customers 35-cents, thereby causing the ascertainable loss. See Pearson , 358 Or. at 144, 361 P.3d 3 ("The UTPA does not require that a consumer's purchase be the 'result of' an unlawful trade practice; it requires that a consumer's ascertainable loss be the 'result of' an unlawful trade practice." (Emphases in original.) ) (Walters, J., concurring).
In sum, on the issue of causation, BP was not entitled to a verdict as a matter of law and, therefore, the trial court did not err in denying its motion for directed verdict. Likewise, the trial court did not err in denying BP's motion to decertify the class on BP's related theory that, because reliance was an element of plaintiff's UTPA claim, reliance could not be proved on a class-wide basis.
C. Due Process Challenge to Statutory Damages
In BP's tenth assignment of error, BP argues that the "trial court erred in denying defendant's alternative motions to strike the statutory damages or to decertify the class because ORS 646.638(8)(a), as applied, violates due process." Both motions challenged the statutory damages awarded by the jury in this case as unconstitutionally excessive, in violation of the federal Due Process Clause. As we will explain, we conclude that the trial court did not err in denying either motion.
At the hearing on its motions, the parties disputed two primary issues: (1) the procedural timeliness of BP's post-verdict motions; and (2) which of two federal due process standards applied to BP's challenge, and whether the statutory damages were excessive under the appropriate standard.
On timeliness, plaintiff argued that "BP has waived the due process arguments it now seeks to belatedly raise two years into the litigation and months after the jury *91 verdict" because it never raised the issue before the jury was discharged. Plaintiff contended that BP should be deemed to have waived its objections to a statutory damages award because BP never requested jury instructions on its proposed legal standard for awarding statutory damages, "never moved *770 for a directed verdict, [never] argued that there was insufficient evidence to support a statutory damage award of $200, [and never] objected to the verdict on the basis that the jury could not award statutory damages as a matter of law in this case." Plaintiff stated that BP's failure to do so prejudiced plaintiff because plaintiff "made the decision not to seek actual damages and only seek UPTA statutory damages," and because plaintiff "would have presented different evidence in the statutory damage case if th[e] court had been given the opportunity to instruct the parties and jury that a higher standard for statutory damages applied." In response, BP contended that its post-verdict motions were timely because, like an award of punitive damages, the statutory damages could not be challenged as excessive until after the jury rendered a verdict. See Parrott v. Carr Chevrolet, Inc ., 331 Or. 537, 558 n. 14, 17 P.3d 473 (2001) ("a party cannot challenge a verdict for punitive damages as excessive until after the jury renders its verdict" (emphasis in original) ).[10]
On the merits of its excessiveness challenge before the trial court, BP relied on the standard used by the Supreme Court in BMW of North America, Inc. v. Gore , 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed. 2d 809 (1996), to evaluate whether punitive damages are excessive, arguing that the same standard applies to evaluate whether statutory damages comport with due process. In Gore , the Supreme Court explained that, because "[e]lementary notions of fairness enshrined in our constitutional jurisprudence dictate *92 that a person receive fair notice not only of the conduct that will subject him to punishment, but also the severity of the penalty a State may impose," the Supreme Court examines three "guideposts" to determine whether an award of punitive damages violates due process-"the degree of reprehensibility of the defendant's conduct," "its ratio to the actual harm inflicted on the plaintiff," and "the civil or criminal penalties that could be imposed for comparable misconduct." Id . at 574-84, 116 S.Ct. 1589. BP contended that a "statutory damages award that is 571 times greater than the harm sustained" is unconstitutional "[i]n light of the low level of reprehensibility of [BP's] conduct."[11] Furthermore, BP asserted that "decertification is an appropriate alternative remedy" to striking the statutory damages because "a class action is not a superior method of resolving a statutory damages claim when it would produce an unconstitutional result."
In response, plaintiff argued that the correct test to determine whether statutory *771 damages violate due process *93 is set out in St. Louis, I.M. & S. Ry. Co. v. Williams , 251 U.S. 63, 40 S.Ct. 71, 64 L.Ed. 139 (1919). In Williams , the Supreme Court explained that statutory damages violate due process "only where the penalty prescribed is so severe and oppressive as to be wholly disproportioned to the offense and obviously unreasonable" because "the states * * * possess a wide latitude of discretion in the matter." Id . at 66-67, 40 S.Ct. 71. Therefore, the penalty must be considered "with due regard for the interests of the public, the numberless opportunities for committing the offense, and the need for securing uniform adherence" to the law. Id . at 67, 40 S.Ct. 71.[12] Under that standard, plaintiff contended that the $200 statutory damage award "is not so 'severe and oppressive' as to be wholly disproportionate to the offense of misleading and overcharging * * * millions of Oregon consumers," and "[l]ack of fairness and advance notice is not an issue here" because "BP has always had fair, advanced, public notice of the legislature's statutory damages of $200 prior to its illegal conduct." Additionally, plaintiff argued that the court should not decertify the class because "[t]he resulting size of aggregate class action damages is not a factor for certification mentioned in ORCP 32," and because class decertification on that ground "is another issue that BP has never challenged before and it could have from the outset as this case has always involved a proposed class and a request for statutory damages."
The trial court denied BP's motion to strike on two grounds. First, the trial court determined that the motion was untimely and, therefore, BP waived its challenge to the statutory damages. The trial court further ruled, in the alternative, that BP's challenge failed on the merits.
*94 Regarding the untimeliness of BP's motion to strike, the court explained:
"I make this finding that this was not * * * raised as an affirmative defense in any responsive pleading.
"It was not proposed as a jury instruction as to the proper standards for awarding statutory damages. There was no proposed jury instruction. And nothing proposed in the jury verdict relating to this.
"* * * [T]his matter was not put before the court at the time plaintiff rested as a basis for a motion for directed verdict, there was no argument that there was insufficient evidence to support a statutory damage award of $200.
"When the verdict was received, there was no objection to the jury verdict because it was somehow constitutionally defective or that the jury could not award statutory damages as a matter of law.
"* * * * *
"* * * [O]n this motion to strike, it's not timely. There is a waiver. Based on what's presented, I'm not persuaded that it is meritorious in any other way."[13]
*772 Ruling alternatively on the merits of BP's motion to strike, the court rejected BP's argument that "those penalties need to be reviewed using the punitive damages standard" and concluded that Gore and the "developing law [on punitive damages] does not apply to statutory penalties." The court continued, concluding that the standard articulated in Williams applied "to the review of statutory damages," and stated that trying to compare statutory damages and punitive damages is like "dealing with apples and oranges" because the amount of "statutory damages * * * are put in state statutes," whereas the amount of punitive *95 damages are decided by a jury. Applying the standard set forth in Williams , the court denied BP's motion to strike the $200 statutory damage award because the award was not "so severe and oppressive as to be wholly disproportioned to the offense and obviously unreasonable." 251 U.S. at 67, 40 S.Ct. 71.
On BP's motion to decertify the class, the court dis-agreed with BP's argument that "the class should be decertified because it is not superior to other available methods for the fair and efficient adjudication of the controversy." The court concluded that BP's motion to decertify the class was "not * * * meritorious" for "the reasons set forth in plaintiff's argument in opposition" to BP's motion to decertify, i.e. , because BP failed to raise that argument in any of its prior motions to decertify the class and because "[t]he resulting size of aggregate class action damages is not a factor for certification mentioned in ORCP 32."
On appeal, BP reprises its argument that its post-verdict motion to strike the statutory damage award or decertify the class was timely. In response, plaintiff contends that BP "waived any objections to a statutory damage award because it never moved for directed verdict on this ground, never argued that there was insufficient evidence to support a statutory damage award of $200, and never objected to the verdict on the basis now argued."
On the merits, BP contends that "[t]he trial court erred in denying defendant's alternative motions to strike the statutory damages or to decertify the class because ORS 646.638(8)(a), as applied, violates due process."[14] Specifically, BP contends that the "$409 million awarded here is grossly disproportionate to the UTPA violation found by the jury and the out-of-pocket expenditure for which it was imposed" because BP's conduct was "not malicious or intentional," it "gave notice of the debit-card fee in various alternative ways, demonstrating that [BP] had no intent to deceive customers," and "[n]o one was put at risk of physical injury, no one's health or safety was endangered, and *96 [BP] did not target the financially vulnerable." In response, plaintiff argues that the trial court did not err in applying the standard articulated by the Supreme Court in Williams to determine that the statutory damages did not violate due process, and that the court did not err in denying defendant's alternative motions to strike the statutory damages or to decertify the class.
We agree with the trial court that BP's post-verdict motion to strike "the request for statutory damages as unconstitutionally excessive in this case" was not raised in a timely manner. As noted, BP relied on Parrott for the proposition that "a party cannot challenge a verdict for punitive damages as excessive until after the jury renders its verdict," but this is not a challenge to an award of punitive damages, the amount of which cannot be ascertained until after a jury renders a verdict. 331 Or. at 558 n. 14, 17 P.3d 473 (emphasis in original). Here, plaintiff alleged in his complaint, and BP admitted in its answer, that BP charged a 35-cent debit card fee, and the exact amount of statutory damages for the alleged UTPA violation-$200 per class member-was requested as relief in plaintiff's complaint. Additionally, during the pleading stage, BP moved to strike plaintiff's claim for punitive damages as "duplicative and improper" in violation of due process because "each plaintiff's actual damages for each alleged violation of the regulation could at most be 35-cents," and *773 because "the statutory damage award would compensate each plaintiff in an amount approximately 571 times his or her actual damages." Thus, the issue of the ratio of the 35-cent out-of-pocket loss to the $200 in statutory damages was known to BP from the outset of the litigation, and the size of the class had no effect on that ratio.
Moreover, the factual assertions on which BP relied for its due process challenge under the framework set out in Gore that related to the reprehensibility of its conduct-i.e. , that its conduct was not malicious or intentional, BP did not take advantage of financially vulnerable parties for its own gain, BP received almost no financial benefit, there was no evidence of any actual or threatened government enforcement, there was no proof that BP had destroyed data or that BP had breached a duty to preserve data, and no one was put *97 at physical risk-were a matter of record at the conclusion of plaintiff's and BP's evidence. See Gore , 517 U.S. at 574-75, 116 S.Ct. 1589 (analyzing the degree of reprehensibility of the defendant's conduct, the ratio of the punitive damage award to the actual harm inflicted upon the plaintiff, and the civil or criminal penalties that could be imposed for comparable misconduct to determine whether an award of punitive damages violates due process). At that point, BP had the record that it needed to raise its argument under Gore via a motion for directed verdict that, in light of the minimal level of reprehensibility of its conduct, an award of statutory damages that would be 571 times plaintiff's actual damages violates due process. See Migis , 282 Or. App. at 808-09, 387 P.3d 381 (concluding that the trial court did not err in rejecting a similar due process argument about statutory penalties on procedural grounds because a prejudgment "motion brought under ORCP 64 B(5)-that evidence is insufficient 'to justify the verdict or other decision, or that is against the law'-requires a prior motion for directed verdict [under ORCP 60 ]").
BP compounded its timeliness problem by not raising the issue after the jury returned its verdict, and before the jury was discharged. BP did not file its motion to strike until nearly three months after the jury had returned its verdict and had been dismissed. BP's motion, however, was not based on anything that transpired after the verdict. Instead, BP relied on the ratio between the out-of-pocket loss suffered per plaintiff (the 35-cent debit fee) and the fixed amount of statutory damages awarded per plaintiff ($200). As already discussed, BP knew from the outset of the case-i.e. , from the filing of plaintiff's complaint-that any award of statutory damages would reflect that ratio. Additionally, evidence about the degree of reprehensibility of BP's conduct was a matter of record before the jury returned its verdict.
The timing of BP's motion to strike the statutory damages award thus ran afoul of "the principle that a faulty verdict cannot be later attacked if the defect was known at the time the verdict was returned and no objection was made," Smith v. J.C. Penney Co. , 269 Or. 643, 655, 525 P.2d 1299 (1974), because "a party waives that objection by failing to assert it 'while the jury is still on hand * * *,' "
*98 Building Structures, Inc. v. Young , 328 Or. 100, 110, 968 P.2d 1287 (1998) (quoting Smith , 269 Or. at 653, 525 P.2d 1299 ). See Hamilton v. Lane County , 204 Or. App. 147, 153, 153 n. 9, 129 P.3d 235 (2006) (the "temporal and procedural posture of * * * an objection to an award of damages as being unconstitutionally 'excessive' " is such that the objection is waived if the defendant fails to seek resubmission to the jury with proper instructions or a new trial while the jury is still present (citing Parrott , 331 Or. at 558 n. 14, 17 P.3d 473 ) ). BP never contended that the jury could only award statutory damages if it found that BP met particular standards, nor did it propose a jury instruction similar to the instruction given in cases involving punitive damages. See Estate of Michelle Schwarz v. Philip Morris Inc. , 348 Or. 442, 459, 235 P.3d 668, adh'd to on recons. , 349 Or. 521, 246 P.3d 479 (2010) ("The Supreme Court has thrust upon state courts the role of determining whether a jury award of punitive damages exceeds the outer limits that substantive due process allows, but it is still the constitutional role of the jury to decide all facts, including those necessary to assess punitive damages in the first instance."). BP waited months after the jury was dismissed to argue that the statutory *774 damages were unconstitutional under the punitive damage analysis articulated in Gore .
In short, BP could have raised its constitutional challenge to the statutory damages either through a motion for directed verdict or a motion to strike the statutory damages made before the jury's discharge, or both. BP, however, did neither. Instead, it waited until the jury was discharged and then, months later, raised its objection for the first time. As a result, BP's motion to strike the statutory damages was untimely. We agree with plaintiff that BP's delay prejudiced plaintiff because he "made the decision not to seek actual damages and only seek UPTA statutory damages," a decision that was impossible to alter once the verdict had been returned and the jury had been discharged. Likewise, if BP had argued that the standard articulated in Gore applied before the jury returned its verdict, plaintiff could "have presented different evidence in the statutory damage case if [the] court had been given the opportunity to instruct the parties and jury that a higher standard for statutory damages applied." For those reasons, the trial court did not err *99 when it rejected BP's untimely motion to strike the request for statutory damages.[15]
Finally, because BP did not challenge the statutory damages award through a timely motion to strike, we also conclude that the trial court did not abuse its discretion in denying BP's post-verdict motion seeking to decertify the class on the same ground. As earlier described, BP also challenged the excessiveness of the statutory damages award through an alternative post-verdict motion. Specifically, it renewed its previous motions to decertify the class, but it did so on the newly advanced theory that a class action cannot be superior when the resulting statutory damages award is unconstitutionally excessive. We question whether BP could challenge the statutory damages award through a motion to decertify when, as here, its motion to strike-which was the procedurally proper way to directly challenge the statutory damages-was not timely and was denied on that ground. In any event, given the untimeliness of BP's direct challenge to the statutory damages, we conclude that the trial court did not abuse its discretion in denying BP's post-verdict challenge to the class certification on the ground that the statutory damages award was excessive. See Pearson , 358 Or. at 107, 361 P.3d 3 (a "trial court's determination that [an] action may proceed as a class action is largely a decision of judicial administration * * * [and in] making such decisions the trial court is customarily granted wide latitude") (internal quotation marks and citation omitted); Migis , 282 Or. App. at 783-89, 387 P.3d 381 (noting that "attempts to decertify late in the litigation process are disfavored" and rejecting the defendant's "due process argument regarding the final-wages claim * * * because that argument was not made until its renewed motion for decertification").
III. CONCLUSION
In sum, we reject BP's third assignment of error because our decision in BP West Coast Products, LLP , held that the Attorney General had the authority to define "condition" under OAR 137-020-0150(1)(b). With respect to BP's *100 second assignment, a debit card fee is a "condition" under OAR 137-020-0150(1)(b) and, therefore, the trial court did not err in denying BP's motion for directed verdict on plaintiff's theory of liability under OAR 137-020-0150(3)(d)(A). In light of it not being error to send plaintiff's theory of liability under OAR 137-020-0150(3)(d)(A) to the jury, and the jury's separate finding that BP violated that rule, we decline to address BP's first assignment concerning whether it was error to send plaintiff's alternative theory of liability under OAR 137-020-0150(4)(e) to the jury because any such error would be harmless. With respect to BP's fourth and fifth assignments on the issues of causation and reliance under the UTPA, the trial court did not err in concluding that proof of reliance was not necessary to prove plaintiff's claims. Therefore, the trial court did not err in denying BP's motion for directed verdict or its motion to decertify the class. Finally, with respect to BP's tenth assignment, BP failed *775 to timely raise its argument that the statutory damages under ORS 646.638(1) and (8)(a) violated due process. Thus, the trial court did not err in denying BP's motion to strike or abuse its discretion in denying BP's motion to decertify the class.
Affirmed.

The UTPA is codified at ORS 646.605 to 646.656. The Attorney General adopted the Gasoline Price Advertising Rule in OAR chapter 137, division 20, declaring unfair or deceptive gasoline price advertising an unlawful trade practice pursuant to ORS 646.608(1)(u). The specific provisions under which plaintiff brought this class action are cited and discussed later in this opinion.

BP's sixth assignment of error is not preserved and, therefore, we decline to address it. We reject BP's seventh, eighth, and ninth assignments of error without discussion.

Under ORS 646.638(1) and (8)(a), class members can recover $200 in statutory damages "if the plaintiffs in the action establish that the members have sustained an ascertainable loss of money or property as a result of a reckless or knowing use or employment by the defendant of a method, act or practice declared unlawful by ORS 646.608."

Although the price per unit may vary depending on how much motor vehicle fuel the customer purchases, the posting serves the purpose of giving the customer notice of the total charge because, as we explain below, the rule permits a service station either to display the whole unit price of any condition or the additional price per unit of measurement for any condition.

As discussed above, in BP West Coast Products, LLP , we concluded that "[c]harging a consumer more than the displayed price if a consumer uses a credit card is an example of a modifying circumstance that affects the availability of the lowest cash price." 284 Or. App. at 732, 396 P.3d 244.

See also OAR 137-020-0150(4)(b) (retailers must "[e]nsure that computing-type dispensing devices automatically compute the full sales price"); OAR 137 020-0150(4)(e) (retailers must "[c]harge the customer only the total amount registered on the dispensing device").

See also Ainslie v. First Interstate Bank , 148 Or. App. 162, 183, 939 P.2d 125 (1997), rev. dismissed , 326 Or. 627, 964 P.2d 1029 (1998) (where damages awarded on contract claim duplicated and were subsumed within those awarded on fiduciary duty claim, contract claim had no independent dispositive effect on the judgment and would not be considered on appeal); Dynagraphics, Inc. v. U.S. National Bank of Oregon , 100 Or. App. 108, 110, 785 P.2d 760, rev. dismissed , 310 Or. 120, 792 P.2d 439 (1990) (where the plaintiff received "identical and overlapping damages" on both a negligence claim and a contract claim, it was only necessary to address one of those claims because "[a] proper verdict on either claim would independently support the judgment").

In BP's fourth assignment of error, BP contends that "[t]he trial court erred in denying defendant's motion for directed verdict, because plaintiff failed to prove that the alleged UTPA violation caused plaintiff and the class to suffer an ascertainable loss of money or property." In BP's fifth assignment of error, BP contends that "[t]he trial court erred in certifying the class and in refusing to decertify the class, because individual questions predominate, making a class action not superior." The procedural history pertinent to those two assignments is set out in more detail below.

ORS 646.608(1)(e) provides, in part, that it is an unlawful trade practice if a person "[r]epresents that real estate, goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, quantities or qualities that the real estate, goods or services do not have."

Significantly, contrary to its own position, BP did object to, and move to strike, plaintiff's request for punitive damages during the pleading stage as unconstitutional, and again by way of a motion for directed verdict, arguing that any award of punitive damages would violate due process. In BP's response to plaintiff's motion to amend his complaint to include a claim for punitive damages, BP contended that "each plaintiff's actual damages for each alleged violation of the regulation could at most be 35-cents," and because "the statutory damage award would compensate each plaintiff in an amount approximately 571 times his or her actual damages * * * an additional punitive damages award would be duplicative and improper."

BP relied on the following facts to argue that BP's conduct was not reprehensible:
"Plaintiffs did not allege, and the jury did not find, that [BP] intended to harm anyone, or that it ignored a risk of physical injury or even severe economic injury * * *.
"* * * There has been no evidence as to how many customers actually visited an ARCO station for the first time and would not have had actual knowledge of the debit fee before choosing to pay for gasoline using a debit card.
"There was no evidence of any actual or threatened government enforcement during the entire period of time the fee was charged at ARCO stations. This is not a situation in which [BP] should have known of a possible violation because a court or the Oregon Department of Justice raised a red flag.
"* * * * *
"* * * [T]here is no evidence of any malicious intent to gouge customers with a hidden fee, or take advantage of financially vulnerable parties for [BP's] own gain * * *.
"The evidence further shows that charging the debit fee was part of [BP's] efforts to offer to sell gasoline at a price lower than its competitors by giving its customers more options * * *.
"* * * * *
"[BP] derived almost no financial benefit from the debit card service fee * * *.
"* * * * *
"The closest plaintiff's counsel came to alleging anything approaching intentional misconduct was in the argument that [BP] had failed to preserve evidence * * *."

See also Sony BMG Music Entertainment v. Tenenbaum , 719 F.3d 67, 70-72 (1st Cir. 2013) (upholding an award of $675,000 in statutory damages when the actual injury was estimated at "no more than $450," and concluding that "Williams applies to awards of statutory damages, * * * while Gore applies to awards of punitive damages"); Vanderbilt Mortg. and Finance, Inc. v. Flores , 692 F.3d 358, 371-74 (5th Cir. 2012) (upholding an award of $120,000 in statutory damages when no actual damages were proven, and concluding that "Gore [is] * * * inapplicable to a case involving * * * civil penalties"); Capitol Records, Inc. v. Thomas-Rasset , 692 F.3d 899, 907-08 (8th Cir. 2012), cert. den. , 568 U.S. 1229, 133 S.Ct. 1584, 185 L.Ed.2d 578 (2013) (noting that the "Supreme Court never has held that the punitive damages guideposts are applicable in the context of statutory damages" and that the Supreme Court's "concern about fair notice does not apply to statutory damages, because those damages are identified and constrained by the authorizing statute").

Just before its ruling on BP's motion to strike, the court summarized the procedural history of the case. The court stated that BP's due process argument
"was not raised in any responsive pleading, such as an affirmative defense; secondly, it was not raised in jury instructions proposed by defendant; thirdly, * * * there was no directed verdict based upon this that was presented * * * [a]nd that there was, fourthly, no objection at the time the jury verdict was returned and before the jury was discharged."
BP agreed that that procedural summary was correct.

ORS 646.638(1) allows the recovery of "actual damages or statutory damages of $200, whichever is greater," and those statutory damages "may be recovered on behalf of class members" under ORS 646.638(8)(a) for a "reckless or knowing" violation.

Because we conclude that BP's motion to strike was not timely, we do not address BP's arguments concerning the application of Gore and Williams to statutory damages.